# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MONTANA
# BILLINGS DIVISION

| | |
|---|---|
| MARIA DALBOTTEN,<br><br>              Plaintiff,<br><br>v.<br><br>C. R. BARD, INC. and BARD PERIPHERAL VASCULAR, INC.,<br><br>              Defendants. | Case No. 1:20-cv-00034-SPW<br><br>**ORDER RE PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON DEFENDANTS' AFFIRMATIVE DEFENSES** |

Before the Court is Plaintiff Maria Dalbotten's Motion for Summary Judgment regarding Defendants' Affirmative Defenses, filed February 4, 2022. (Doc. 114). Defendants filed a response to the motion on February 25, 2022. (Doc. 141). Plaintiff replied on March 10, 2022. (Doc. 161). The motion is deemed ripe and ready for adjudication.

Plaintiff seeks summary judgment on Defendants' affirmative defenses of statute of limitations, voluntary exposure to a known risk/failure to mitigate, comparative negligence/fault, assumption of the risk, misuse, non-party negligence, and apportionment between parties at fault pursuant to Uniform Contribution Among Tortfeasors Act. (Doc. 115 at 2). Defendants agreed to withdraw all challenged affirmative defenses except their affirmative defenses

1

based on statute of limitations, failure to mitigate damages, and comparative negligence/fault. (Doc. 141 at 2). Regarding these three affirmative defenses, Defendants assert that genuine issues of material fact make summary judgment inappropriate. (*Id.* at 3). For the following reasons, the Court grants Plaintiff's motion.

## I. BACKGROUND

On August 23, 2006, Maria Dalbotten underwent surgery in Billings, Montana following a catastrophic automobile accident. Dalbotten was in a coma at the time of surgery. Dr. John Craig implanted a C. R. Bard G2 inferior vena cava ("IVC") filter in Dalbotten in order to treat traumatic cervical and brain injuries. As part of his medical care, Dr. Craig made a procedural note on the implantation stating that the filter would ideally be removed within six to twelve months if removal was deemed clinically necessary. Around the time of the implantation surgery, Dalbotten's mother, Barbara Padden, was given an informational brochure on the G2 IVC filter entitled G2 Filter System for Permanent Placement. While at Billings Clinic, Dalbotten saw Dr. Bryan Blackshear for rehabilitation.

On September 6, 2006, Dalbotten was transferred to Seattle, Washington for follow up inpatient care and rehabilitation. As part of this rehabilitation, Dalbotten saw Dr. Robert Rostomily on October 2 and they discussed the possible removal of the G2 IVC filter. Dalbotten and her mother returned to Dr. Rostomily's office on

2

October 16 and discussed the filter further with Dr. Rostomily's Physician's Assistant, Alexa Martin. Martin corresponded with a Bard Systems representative who informed Martin that the device was not yet FDA approved but remained in phase III trials. The representative advised against removal of the filter at that time but stated that Dalbotten could follow up with Interventional Radiology about possible removal. It is unclear if Dalbotten ever did follow up with Interventional Radiology. She did not have the filter removed at that time.

In December 2008, Dalbotten began experiencing discomfort and pain in her chest. She visited a hospital in Vancouver, Washington regarding these symptoms and was eventually sent home with painkillers. The symptoms did not improve. Soon afterwards, on December 30, 2008, Dalbotten was hospitalized at UCLA Medical Center after fainting at her then-residence in Santa Monica. Doctors discovered approximately 25 pounds of fluid build-up around her heart, lungs and stomach but could not determine an exact cause. Dalbotten was eventually discharged and continued treatment on an outpatient basis.

In the summer of 2015, Dalbotten saw a television report on the Bard G2 IVC filter that described how the filter system could fail. Dalbotten contacted the Harborview Medical Center in Seattle, Washington to determine whether her filter had failed. On December 11, 2015, Dr. Christopher Ingraham ordered a CT scan that demonstrated the filter was tilted and the filter legs were extended beyond the

3

confines of the IVC. Dr. Ingraham referred Dalbotten to Dr. William Kuo at Stanford Hospital.

On March 5, 2016, after a meeting and diagnosis, Dr. Kuo was able to remove most of the G2 IVC filter from Dalbotten. However, Dr. Kuo advised Dalbotten that a portion of the filter had broken off and was embedded in the right ventricle of her heart. Dr. Kuo reviewed the 2008 UCLA radiology and determined the filter fragment was present in Dalbotten's heart in those films.

On May 20, 2016, Dr. Nahush Mokadam at the University of Washington Medical Center removed the filter fragment from Dalbotten's heart. Dalbotten then filed the present lawsuit as a member action in multi district litigation on July 11, 2016.

## II. LEGAL STANDARD

Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party and a dispute is "material" only if it could affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

4

In considering a motion for summary judgment, the Court "may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 130, 150 (2000); *Anderson*, 477 U.S. at 249-50. The Court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in the non-moving party's favor. *Anderson*, 477 U.S. at 255; *Betz v. Trainer Wortham & Co., Inc.*, 504 F.3d 1017, 1020–21 (9th Cir. 2007).

## III. DISCUSSION

### A. Statute of Limitations

For product liability claims in Montana, the statute of limitations is three years. Mont. Code Ann. § 27-2-204. "[A] claim or cause of action accrues when all elements of the claim or cause exist or have occurred, the right to maintain an action on the claim or cause is complete, and a court or other agency is authorized to accept jurisdiction of the action." Mont. Code Ann. § 27-2-102(1)(a). "The period of limitation does not begin on any claim or cause of action for an injury to person or property until the facts constituting the claim have been discovered or, in the exercise of due diligence, should have been discovered by the injured party." Mont. Code Ann. § 27-2-102(3). This discovery rule applies when the "facts constituting the claim are by their nature concealed or self-concealing." Mont. Code Ann. § 27-2-102(3)(a).

5

Dalbotten filed her complaint on July 11, 2016. Defendants argue there is a question of fact about what Dalbotten knew or should have known about her injuries three years prior to that date. Specifically, Defendants suggest that had Dalbotten "exercised due diligence, she should have known the facts constituting her claims in 2009, at the latest." (Doc. 141 at 4). Defendants point to the testimony of Dalbotten's proposed expert, Dr. Muehrcke, that the images taken during her 2009 hospitalization at UCLA Medical Center depict a fragment of the G2 filter perforating her heart. Further, Defendants point to a procedural note from Dr. Craig, the implanting surgeon, that stated the G2 filter would ideally be removed in six to twelve months and the discussions with Dr. Rostomily and Alexa Martin to follow up with Interventional Radiology in 2006 about possible filter removal. This evidence, in Defendants' opinion, presents a factual question about what Dalbotten knew about the G2 filter and her injuries or, in the exercise of reasonable due diligence, should have known before July 11, 2013.

Dalbotten responds that Defendants' arguments are speculative at best, and Defendants cannot point to any specific evidence that either Dalbotten or any of her treating physicians suspected the G2 filter as the cause of the 2009 UCLA hospitalization.

The Court agrees with Dalbotten and finds Defendants' arguments unpersuasive. First, it is undisputed that Dalbotten did not begin to experience

6

discomfort in her chest until 2008 and was hospitalized in 2009 at UCLA Medical Center. Prior to this, while a couple procedural notes documented a potential removal of the G2 filter, Defendants have presented no evidence that this desire to remove the filter stemmed from a fear of injury should the filter remain for a prolonged duration. On the contrary, the brochure provided to Dalbotten's mother at the time of the device implantation and produced by Defendants described the G2 filter as a permanent implant device. Physician's assistant Alexa Martin's discussion with a Bard representation in 2006 reinforced this understanding when the representative advised against removing the G2 filter. When Dalbotten's injury began in 2008, she had no reason to know or even suspect that the medical issues stemmed from the filter device.

Second, when Dalbotten was hospitalized in 2009, a team of physicians reviewed chest x-rays and other medical imaging and consulted on possible causes of her symptoms. Dalbotten was told by these physicians her condition might have resulted from lupus, cancer, a virus, or an autoimmune disease but no physician offered a definitive diagnosis. Further, no physician associated her symptoms with the G2 filter or identified a fragment of the filter lodged in the right ventricle of her heart. Defendants point to the post-hac testimony of Dalbotten's proposed expert identifying the filter fragment in a 2009 image as evidence that Dalbotten should have continued to seek medical advice for her condition. However, Defendants

7

present no legal authority demonstrating how the actions Dalbotten took in 2008 and 2009 did not constitute reasonable due diligence. Medical imaging and diagnosis in 2015 and 2016 were readily able to identify the filter fragment in Dalbotten's right ventricle once physicians knew to look for it. However, Defendants failed to produce any evidence that prior to 2015 physicians identified or should have identified the filter fragment and linked it to the buildup of fluid in Dalbotten's chest. Defendants appear to argue that, despite being told by a team of physicians at UCLA Medical Center that they could not identify a definitive cause of Dalbotten's condition, she should have known to continue seeking medical advice until the filter fragment was found. The Court finds this argument unreasonable and unpersuasive. Therefore, in the absence of a question of material fact, the Court finds summary judgment on Defendants' statute of limitations defense appropriate in Dalbotten's favor.

### B. Mitigation of Damages

Dalbotten next argues that no evidence exists suggesting she failed to mitigate her damages and that summary judgment is therefore appropriate in her favor on that affirmative defense. Montana Pattern Jury Instruction 25.94 states in part: "The plaintiff has a duty to minimize his/her damages. However, that duty does not require him/her to do what is unreasonable or impracticable . . . ." Evidence of a plaintiff's failure to follow medical advice or employ reasonable

8

diligence in seeking treatment for injuries may be considered by the jury when determining whether the plaintiff properly mitigated damages. *Frisnegger v. Gibson*, 598 P.2d 574, 581 (Mont. 1979).

Defendants respond that questions of fact exist "for a reasonable factfinder to conclude that Plaintiff failed to mitigate damages from her alleged injuries by not following up with Interventional Radiology in the months after her filter implant to evaluate filter removal per the instructions from several of her physicians." (Doc. 141 at 9). Defendants point specifically to Dr. Craig's procedural note made after implanting the filter where Dr. Craig states that the filter would ideally be removed in six to twelve months, "if clinically indicated." (Doc. 97-5, Ex. J, Med. Rec. at 19, 21). Defendants also cite to Dr. Blackshear's remarks in August 2006 that he had a discussion with Dalbotten's family about rehabilitation and noted that the G2 filter was a recoverable filter. (Doc. 141 at 10). Finally, Defendants present the summary from Dalbotten's discharge from the University of Washington Medical Center on September 19, 2006, that expressed how a discussion should happen between Dalbotten and interventional radiology regarding removing the G2 filter and that the filter should be removed within 3 months. (*Id.*).

However, the evidence cited by Defendants all occurred before Dalbotten began experiencing chest pain and discomfort in 2008—the start of the damages

9

she complains of. The evidence cited also occurred before any physician suggested in 2015 that the G2 filter could be the cause of her chest pain and fluid buildup. Dalbotten argues that this timeline makes Defendants' evidence irrelevant to the question of whether Dalbotten properly mitigated her damages because those damages had not yet occurred. The Court agrees. Further, Defendants have presented no evidence that Dalbotten knew or had any way of knowing that the G2 filter could fail and cause the symptoms she experienced starting in 2008. While several medical notes express a desire to discuss the possible removal of the filter in 2006, there is no evidence that Dalbotten or her family was ever told that failure to remove the filter device could have adverse consequences. The informational brochure provided to Dalbotten's family at the time of implant described the G2 filter as a permanent implant device. When Physician Assistant Alexa Martin discussed filter removal with a Bard representative in 2006, the representative advised against removing the device.

The cases cited by Defendants involve a plaintiff's failure to follow medical advice after damages had occurred. It is undisputed that Dalbotten first became aware of the G2 filter's potential to cause harm in 2015 after seeing a television advertisement addressing the issue. Dalbotten then contacted Harborview Medical Center in Seattle, Washington and saw Dr. Ingraham for possible treatment. Defendants do not argue that Dalbotten failed to mitigate her damages at any point

after becoming aware of the possibility the G2 filter could fragment and migrate to areas of her body in 2015. Defendants do not even present an argument that Dalbotten failed to properly mitigate her damages after her hospitalization in 2008 for chest pain and fluid buildup. In short, Defendants appear to argue that Dalbotten failed to properly prevent rather than mitigate her damages, yet Defendants have presented no legal support for this argument. Therefore, the Court finds summary judgment on this point appropriate in Dalbotten's favor and dismisses Defendants' failure to mitigate damages affirmative defense.

### C. Comparative/Contributory Negligence

Plaintiff argues that, under Montana law, comparative or contributory negligence is not a defense to strict product liability. *See Malcolm v. Evenflo Co.*, 217 P.3d 514, 521 (Mont. 2009); Mont. Code Ann. § 27-1-719(5). Defendants do not contest this assertion regarding Plaintiff's strict product liability claims. However, Defendants maintain that their defense is valid as to Plaintiff's constructive fraud claim.

Constructive fraud consists of the following:

> (1) any breach of duty that, without an actually fraudulent intent, gains an advantage to the person in fault or anyone claiming under the person in fault by misleading another person to that person's prejudice or to the prejudice of anyone claiming under that person; or (2) any act or omission that the law especially declares to be fraudulent, without respect to actual fraud.

11

Mont. Code Ann. § 28-2-406. Defendants assert Plaintiff's constructive fraud claim is actually a negligent misrepresentation claim because Plaintiff argues Defendants had an on-going duty to warn Plaintiff of the dangers inherent with the G2 filter. Plaintiff does not appear to contest Defendants' ability to raise a contributory negligence defense to her constructive fraud claim. Plaintiff argues instead that Defendants failed to "direct the Court's or counsel's attention to what conduct of the Plaintiff could be considered to show that she was somehow comparatively negligent concerning the constructive fraud claim." (Doc. 161 at 12). The information provided to Plaintiff, according to her argument, demonstrated that the G2 filter was designed and intended to be a permanent implant. Plaintiff cites to the informational brochure created and distributed by Defendants as support.

In their brief, Defendants presented their evidence in support of comparative negligence as follows:

> Plaintiff was contributory negligent for the reasons mentioned and discussed above, including Plaintiff's failure to follow up with Interventional Radiology in the months after her filer [sic.] implant to evaluate filter removal pers [sic.] the instructions from several of her physicians and Plaintiff's failure to follow up with Interventional Radiology or any other medical provider in 2009 to determine whether the filter was causing any medical issues.

(Doc. 141 at 14).

In short, Defendants attempt to make the same argument here that they presented in support of their failure to mitigate damages defense—that despite representations to the contrary, Dalbotten should have known the possible consequences of failing to follow up on removing the G2 filter and her failure to follow up was negligent.

The Court finds this argument speculative, at best, and unsupported by the evidence presented. The relevant evidence in the record consists of the following: (1) Dr. Craig's procedure note stating that the G2 filter would ideally be retrieved within six to twelve months, if clinically indicated; (2) Dr. Blackshear's procedure note that he discussed rehabilitation issues with Plaintiff's family including that Plaintiff had a recoverable filter implanted; (3) an inpatient rehabilitation discharge summary note stating that there should be a discussion with surgeons about when to remove the filter and that removal would ideally occur within three months; (4) a G2 Filter System for Permanent Placement brochure, given to Plaintiff's mother, stating that the filter was designed to a permanent implant that does not need to be removed or repositioned; and (5) Physician Assistant Martin's report stating she spoke with a Bard representative about removing the filter, that the representative advised against removal at that time because the device was not FDA approved, and that phase III trials were ongoing.

Notably lacking from this list of evidence is any report, medical note, or brochure describing the possible adverse side effects of leaving the G2 filter in a patient's body for an extended period of time. According to the record, Plaintiff did not discover this information until witnessing the 2015 television report on the G2 filter. Defendants have presented no evidence that Plaintiff could have discovered this information sooner had she followed up with her physicians in 2006, yet Defendants argue Plaintiff was contributorily negligent for failing to do so. The Court finds Defendants' argument entirely speculative and rejects it. Summary judgment is therefore appropriate in Plaintiff's favor on the issue of Defendants' contributory negligence affirmative defense.

## IV. CONCLUSION

**IT IS HEREBY ORDERED** that Plaintiff Maria Dalbotten's Motion for Summary Judgment on Defendants' Affirmative Defenses (Doc. 114) is **GRANTED**.

The Clerk of Court is directed to notify parties of this order.

DATED this 27th day of July, 2022.

SUSAN P. WATTERS
United States District Court Judge